**AFFIRMED as MODIFED and Opinion Filed March 18, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-18-00274-CR

**UNDRA DONNELL CORNELIOUS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 6**
**Dallas County, Texas**
**Trial Court Cause No. F-1576737-X**

# MEMORANDUM OPINION

Before Justices Whitehill, Molberg, and Reichek
Opinion by Justice Reichek

A jury found Undra Donnell Cornelious guilty of aggravated sexual assault of a child and assessed punishment, enhanced by two prior felony convictions, at ninety-nine years in prison. In seven issues, appellant complains the trial court abused its discretion by admitting evidence of a similar extraneous offense and his prior felony convictions. For reasons discussed below, we overrule appellant's issues. On our own motion, we modify the judgment to reflect appellant pleaded true to the enhancement paragraphs and both paragraphs were found to be true. We affirm the trial court's judgment as modified.

FACTUAL BACKGROUND

For several months in 2015, A.T. lived in a two-bedroom apartment with her mother and infant brother; her mother's friend, Cordia Cornelious; Cordia's's daughters, N.C. and Z.C.; and

Cordia's father, appellant. Cordia slept in one bedroom, and her daughters slept in the other bedroom. A.T., her mother, and brother slept on a pallet on the living room floor, and appellant slept on the couch in that same room. Sometimes, A.T., who was six years old, slept in the bedroom with N.C. and Z.C., who were about her age. Cordia's younger sister, L.S., often spent the night and would also sleep with the other girls.[1]

Shortly after Thanksgiving, Z.C. told Cordia "something" about A.T. and appellant that made her "heart stop." Cordia spoke to A.T., who said "something about sex and Pawpaw," meaning appellant. Cordia did not ask for any details. Cordia immediately went to talk to her grandmother, who is appellant's mother, and the grandmother called the police. Appellant was arrested that night. Over the next week, A.T. was interviewed at the Dallas Children's Advocacy Center and was examined by a pediatric nurse at Children's Hospital.

At trial, A.T. testified to two separate incidents involving appellant. In the first incident, A.T. said she was sleeping in the bed with N.C. and Z.C. when appellant came in, pulled down her pajama bottoms, and put his "private part" on her "butt" or "booty hole." She said it hurt. On another occasion, she said she was in the living room with appellant when he pulled her clothes down, pulled down his own pants, and then "put his private" in her "butt." By "private," A.T. meant where he "goes pee;" by "booty hole," she meant where "poop comes out."

On cross-examination, defense counsel asked A.T. if appellant had ever "punished" her or told her to do something she did not want to do. A.T. answered "yes," and said appellant had told her to "[c]lean up the room." Counsel asked A.T. if she "ever liked cleaning up the room," and A.T. said she did not. Counsel then noted that A.T. had "told a story today or told, I guess we could say, what happened," and asked A.T. how many times she had told her story. When A.T.

---

[1] In addition to the charge involving A.T., appellant was indicted on a charge of continuous sexual abuse of a child in connection with the abuse of L.S. The cases were scheduled to be tried together. On the first day of trial, appellant moved to sever the cases, and the trial court granted the motion.

said she did not know, counsel asked if it was more than "ten times." A.T. said she did not think so. Counsel then asked if it was more than five times, and A.T. again said she did not think so. When counsel asked if it was more than three times, A.T. responded, "Kind of." Counsel then asked A.T. if she knew "what it means to rehearse," and A.T. responded, "Like doing a song?" Counsel replied, "Yeah. Somebody doing a song over and over again until they get it better with each telling." He asked A.T. whether she "rehearsed telling the store [sic] about Uncle Undra," and A.T. said she had. Counsel asked who was in the room when she rehearsed telling the story, and A.T. replied, "My mother and my baby brother and Reynie's partner." After asking whether appellant got along with other kids in the house, counsel returned to the earlier issue of cleaning the room:

> [DEFENSE COUNSEL]: . . . Okay. Now, the first time what you talked about earlier happened, you said it happened with Uncle Undra, had he told you to clean the room that day?
>
> [A.T.]: Yes.
>
> [DEFENSE COUNSEL]: And you didn't like that, did you?
>
> [A.T.] No.

On redirect, the prosecutor asked A.T. if anybody told her to lie "about this stuff that happened," and A.T. said no. After A.T.'s testimony, an off-the-record discussion was held at the bench. Nothing was said on the record about this discussion before the State called its next witness, L.S.

L.S., who was eleven years old at the time of trial,[2] testified she sometimes spent the night with Z.C., N.C., and A.T., and they all slept in the same bed. One night, while N.C. and A.T. were sleeping, she and Z.C. got up and went to the restroom. When they returned to the bedroom, L.S. saw appellant, with his clothes off, on top of A.T. Appellant "got up fast," closed the door, and

---

[2] The trial was held about nineteen months after the allegations of abuse were first reported.

told L.S. and Z.C. to go to Cordia's room. L.S. said what she saw was "wrong," but she did not tell anyone because she was scared. On another occasion, she saw A.T. and appellant on the couch in the living room; A.T. was sitting on top of appellant. She said it "was not normal."

On cross-examination, L.S. explained that the way A.T. sat on appellant appeared "awkward" and "seemed wrong and looked wrong." Defense counsel then asked the following:

> [DEFENSE COUNSEL]: Now, did you get along with Undra when you were living over there at the apartment?
>
> [L.S.]: Yes.
>
> [DEFENSE COUNSEL]: You did. Okay. Did he ever do anything to you that got you upset?
>
> [L.S.]: (No response.)
>
> [DEFENSE COUNSEL]: I mean, when I ask that I mean did he tell you to do some homework or do some housework or anything like that that you didn't want to do?
>
> [L.S.]: No.

Counsel then asked L.S. if her mother got along with appellant, and L.S. said no. Counsel asked why not, and L.S. said she did not know.

Following L.S.'s cross-examination, another off-the-record discussion occurred at the bench after which the trial court had the bailiff take the jury out of the courtroom. On the record, defense counsel explained he did not intend to "open the door" when he asked L.S. if appellant had done anything to her that upset her. After the trial court had the court reporter read the question and answer, the prosecutor argued the exchange, along with questions as to whether L.S. and her mother got along with appellant, opened the door to "what happened" to L.S. Defense counsel disagreed, explaining that his "phrasing [the question] as I did at the end gets to how I was asking the question." The trial court ruled appellant had opened the door and then overruled his objection that the evidence was more prejudicial than probative.

–4–

After jurors returned to the courtroom, L.S. testified that she spent the night at the apartment with Z.C. and N.C. During the night, appellant came into the room, took off her clothes, and touched his "middle part" to her "bottom." Using a drawing, L.S. identified "middle part" as the "front part" where boys go to the bathroom. She said it happened a lot of times. L.S. also recounted an incident in the living room where appellant bent her over a chair. Appellant was behind her with his "middle part" touching her "bottom" and was moving his body. She did not tell because she was scared.

Kim Skidmore, a forensic interviewer with the Dallas Children's Advocacy Center, said she interviewed A.T. for fifty minutes. A.T. was apprehensive and answered, "I don't know" to many questions, which Skidmore said was A.T.'s way of saying she did not want to talk about it. But, Skidmore said, A.T. did tell her that appellant's "thing went on her booboo hole" and that it hurt.

Sandra Onyinanya, a pediatric nurse practitioner at Children Medical Center Dallas, examined A.T. Although the results of the examination were normal, Onyinanya said that was not unexpected since the abuse had occurred at least a week earlier. Onyinanya explained that tissue within the anus heals very quickly, so any injury from several days before would have healed and any DNA would have been destroyed.

Appellant testified he did not do the things that A.T. accused him of and did not know why the girls would lie. He repeatedly testified he was never alone with the girls, even though he was the only adult in the house who, at least for some time, was not working. He acknowledged that he had a prior conviction for misdemeanor assault family violence in August 2015 and felony convictions for burglary of a habitation in 2006, theft in 1988, aggravated robbery in 1985, and burglary of a building in 1985.

In his first three issues, appellant argues the trial court abused its discretion in allowing L.S. to testify that appellant had also abused her. Appellant argues that (1) he did not "open the door" to the evidence when he asked L.S. if appellant had ever done anything to make her upset, (2) the evidence was not admissible to rebut a defensive issue, and (3) even if admissible on one of these bases, it should have been excluded because its probative value was substantially outweighed by unfair prejudice.

We review a trial judge's decision on the admissibility of evidence under an abuse of discretion standard. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). A trial judge abuses her discretion when her decision falls outside the zone of reasonable disagreement. *Id.* If the trial court's evidentiary ruling is correct under any applicable theory of law, it will not be disturbed even if the trial court gave a wrong or insufficient reason for the ruling. *Id.*

Generally, extraneous-offense evidence is not admissible at the guilt phase of a trial to prove that a defendant committed the charged offense in conformity with a bad character. TEX. R. EVID. 404(b); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). However, such evidence may be admissible when it has relevance apart from character conformity such as rebuttal of a defensive theory. *Devoe*, 354 S.W.3d at 469. *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009). Specifically, the State may present extraneous-offense evidence to rebut a defensive theory of fabrication. *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008).

This evidence may be raised in the defendant's opening statement or by the State's witnesses during cross-examination, but the fact that the State's witnesses are cross-examined does not, in and of itself, authorize the introduction of extraneous-offense evidence. *Id.* (defense opening statement may open door to admission of extraneous offense evidence); *Ransom v. State*, 920 S.W.2d 288, 301 (Tex. Crim. App. 1994) (concluding trial court did not err in admitting

evidence to rebut defensive theory raised on cross-examination of State's witnesses); *Caldwell v. State*, 477 S.W.2d 977, 879 (Tex. Crim. App. 1972). Likewise, a challenge to the complainant's credibility on cross-examination does not automatically open the door to extraneous-offense evidence. *See Caldwell*, 477 S.W.2d at 879; *Bargas v. State*, 252 S.W.3d 876, 890 (Tex. App.— Houston [14th Dist.] 2008, no pet.). Instead, the response elicited from the State's witnesses on cross-examination must be sufficient to construct a defensive theory before the State may introduce extraneous-offense evidence in rebuttal. *See Walker v. State*, 588 S.W.2d 920, 922–23 (Tex. Crim. App. 1979); *Aguillen v. State*, 534 S.W.3d 701, 714 (Tex. App.—Texarkana 2017, no pet.).

In *Wheeler v. State*, the defendant was charged with the aggravated sexual assault of nine-year-old S.E., who was a friend and classmate of his daughter. 67 S.W.3d 879, 880 (Tex. Crim. App. 2002). After the defendant suggested he was the victim of a frame-up and that S.E. had fabricated the allegations against him, the trial court allowed the State to put on evidence that appellant had previously assaulted another young girl, his niece. *Id*. at 886. The court of criminal appeals concluded the extraneous offense evidence contradicted the defendant's frame-up theory by showing the defendant's misconduct in circumstances in which the child making the allegations was not motivated to lie by money or revenge and was thus relevant. *Id*. at 887.

In *Dennis v. State*, the defendant was charged with sexually assaulting his fourteen-year-old daughter on numerous occasions when she visited him at his apartment. 178 S.W.3d, 172 175–76 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). In his opening and closing arguments, the defendant argued the child fabricated the sexual assault allegations because she was angry at him for taking away her cell phone and disciplining her for poor grades at school. *Id*. at 178. He also cross-examined witnesses on these issues. *Id*. To rebut the defensive theory of fabrication, the trial court allowed the State to present evidence that the defendant sexually assaulted his girlfriend's teenage cousin when she spent the night at the apartment. *Id*. at 176. Relying on

*Wheeler*, the court of appeals concluded the extraneous offense evidence was relevant to show that, under similar circumstances, the defendant sexually assaulted another child. *Id.*

Here, it is at least subject to reasonable disagreement whether the extraneous conduct evidence was admissible for the noncharacter-conformity purpose of rebutting the defensive theory of fabrication. On cross-examination, defense counsel adduced evidence from A.T. that appellant made her clean the room and she did not like doing that. Then, he asked a series of questions designed to suggest A.T. had rehearsed her story several times until it got "better" with each telling. He then asked her if appellant assaulted her on a day he also told her to clean the room. With these questions, the defense suggested to the jury that A.T. made up the allegations against appellant because he made her do something she did not want to do, i.e., clean her room. Although appellant argues the "issue was not pursued further or even argued by the defense," the questions asked made their point and were sufficient to raise a fabrication defense. Once a fabrication defense was raised, the State was allowed to offer the extraneous offense against L.S., who testified she was sexually assaulted by appellant under circumstances markedly similar that of A.T. *See id.* Consequently, the evidence supported a defensive theory other than character conformity. Having concluded the evidence was admissible to rebut a defensive theory of fabrication, we need not address whether the evidence was likewise admissible because appellant "opened the door" with his questioning of L.S.

Otherwise admissible evidence may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Martinez v. State*, 327 S.W.3d 727, 737 (Tex. Crim. App. 2010); *Young v. State*, 283 S.W.3d 854, 876 (Tex. Crim. App. 2009). Rule 403 does not require exclusion of

evidence simply because it creates prejudice; rather, the prejudice must be unfair. *Martinez*, 327 S.W.3d at 737.

Under a rule 403 analysis, courts should balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 642–43 (Tex. Crim. App. 2006). These factors may well blend together in practice. *Id.*

Here, L.S.'s testimony was similar to that of A.T. Like A.T., she was sleeping in the bedroom with the other girls when appellant came into the room, took off her clothes, and touched his "middle part" to her "bottom." This extraneous offense evidence suggests that A.T.'s allegations were not the result of appellant making her do a chore she did not like to do. As such, the evidence was relevant to rebut appellant's theory of fabrication, and the trial court could have reasonably determined the State had a great need for it even though L.S. also testified that she witnessed the assault on A.T. Although L.S.'s testimony may have had a tendency to suggest a decision on an improper basis because it involved another sexual assault on a child, it was not lengthy or graphic and was no more serious than the allegations forming the basis for the indictment. *See Robisheaux v. State*, 483 S.W.3d 205, 220 (Tex. App.—Austin 2016, pet ref'd). Finally, there is nothing in the record to suggest that the testimony confused or misled the jury or that the jury was unequipped to properly evaluate it. We conclude the trial court's decision to admit the extraneous offense evidence fell within the zone of reasonable disagreement and thus was not an abuse of discretion. We therefore overrule the second and third issue.

In issues four through six, appellant argues the trial court erred by allowing the State to impeach him with prior convictions for burglary of a building, theft, aggravated robbery, and burglary of a habitation.

Appellant elected to testify at the guilt-innocence phase of trial. Before he testified, he sought to exclude evidence of his prior convictions. In a hearing outside the jury's presence, there was considerable discussion about the various offenses and their corresponding dates as well as the number of times appellant had been to prison. Appellant objected to their admission on the basis that their probative value was substantially outweighed by their prejudicial effect and therefore inadmissible under Texas Rule of Evidence 609(b). The trial court concluded otherwise and overruled the objection.

At the end of appellant's direct testimony, his counsel preemptively asked him about the prior convictions that he complains of on appeal, and appellant acknowledged he had been convicted of those offenses. On cross-examination, the State again asked about the convictions and he again acknowledged them.

"[A] defendant who preemptively introduces evidence of a prior conviction on direct examination may not on appeal claim that the admission of such evidence was error." *Ohler v. United States*, 529 U.S. 753, 760 (2000); *see Roderick v. State*, 494 S.W.3d 868, 881 (Tex. App.— Houston [14th Dist.] 2016, no pet.) ("By testifying first on direct examination, appellant waived any error regarding the trial court's ruling on the admissibility of his prior conviction.").[3] By electing to introduce his prior convictions to the jury when he testified on direct examination,

---

[3] *See also Miller v. State*, 05-16-01336-CR, 2017 WL 5559595, at *2 (Tex. App.—Dallas Nov. 14, 2017, no pet.) (mem. op., not designated for publication) (concluding appellant waived complaint regarding admissibility of prior convictions when he introduced them on direct examination); *Juarez v. State*, No. 05-12-01504-CR, 2014 WL 5475352, at *2 (Tex. App.—Dallas Oct. 30, 2014, pet. ref'd) (mem. op. not designated for publication) (same)

appellant waived any error by the trial court's ruling that the convictions were admissible. We overrule issues four through six.

JUDGMENT MODIFICATION

Finally, although the record reflects appellant pleaded true to two enhancement paragraphs alleged in the indictment and the jury found both enhancements paragraphs to be true, the judgment lists the notation "N/A" in the corresponding sections. We have the authority to correct a judgment below to make the record "speak the truth" when we have the necessary data and information to do so. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, we modify the judgment to reflect appellant pleaded true to two enhancement paragraphs and the paragraphs were found to be true.

As modified, we affirm the trial court's judgment.


/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
180274F.U05

–11–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

UNDRA DONNELL CORNELIOUS, Appellant

No. 05-18-00274-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 6, Dallas County, Texas
Trial Court Cause No. F-1576737-X.
Opinion delivered by Justice Reichek; Justices Whitehill and Molberg participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

To reflect (1) Undra Donnell Cornelious pleaded true to the 1st Enhancement Paragraph and the 2nd Enhancement Paragraph and (2) Findings on 1st Enhancement Paragraph and Findings on 2nd Enhancement Paragraph are True.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered March 18, 2019